**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Matthew T. Macken (appearance *pro hac vice*)
mmacken@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CARELLA BYRNE CECCHI
BRODY & AGNELLO, PC**
James E. Cecchi (*pro hac vice forthcoming*)
jcecchi@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

*Counsel for Plaintiff and the proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In Re Robinhood Cash Sweep Program Litigation* | Case No. 3:24-cv-07442-RFL |
| | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION** |
| | **Redacted** |
| | Hearing Date: September 22, 2026<br>Hearing Time: 10:00 a.m.<br>Judge: Hon. Rita F. Lin<br>Courtroom: 15 |

TO THE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on September 22, 2026, at 10:00 a.m., or as soon thereafter as the Court is available, in Courtroom 15 of the United States District Court for the Northern District of California, at the San Francisco Courthouse, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff Basudeb Dey, respectfully moves for an Order pursuant to Rules 23(a), 23(b)(3), and 23(g) of the Federal Rules of Civil Procedure appointing Plaintiff as Class Representative, appointing Kessler Topaz Meltzer & Check, LLP and Carella Byrne Cecchi Brody & Agnello, P.C as Class Counsel, and certifying this action to proceed as a class action on behalf of the following Class:

> All persons who were Robinhood Non-Gold members at any time between September 23, 2022 through November 10, 2025 who had cash deposits in one or more Program Banks pursuant to Robinhood's Deposit Sweep Program, excluding the Excluded Non-Gold Members.

Excluded from the Class[1] are "Excluded Non-Gold Members" defined as:

> a. Any person who enrolled in Robinhood Gold at any point beginning and/or subsequent to September 23, 2022, effective the date in which they enrolled in Robinhood Gold, even if they subsequently unenrolled in Robinhood Gold.
>
> b. Any person who enrolled in Robinhood Gold at any point prior to September 23, 2022, who was enrolled on September 23, 2022, and who at any point subsequent to September 23, 2022 unenrolled.

DATED: May 15, 2026                          Respectfully submitted,

/s/ *Melissa L. Yeates*
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Matthew T. Macken (appearance *pro hac vice*)
mmacken@ktmc.com
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Road

---

[1] Also excluded from the Class are Defendants and their parents, subsidiaries, and corporate affiliates, and governmental entities.

Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and–

Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and–

James E. Cecchi (*pro hac vice* forthcoming)
jcecchi@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile: (973)-994-1744

*Interim Co-Lead Class Counsel*

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................................ 1

II.   BACKGROUND ................................................................................................................... 4

      A.    Robinhood Promised to Pay Non-Gold Customers an Interest Rate on their
            Uninvested Cash that Varied Based on Prevailing Business and Economic
            Conditions and Was Determined by the Amount the Program Banks Were Willing
            to Pay, Minus Its Fee, if Any .............................................................................. 4

      B.    As Interest Rates Rose and Stayed High, Robinhood Refused to Vary Non-Gold
            Rates Based on Economic and Business Conditions, or Determine Rates Based
            on the Amounts Paid by Program Banks, and Instead Kept Increasing Spreads for
            Itself as its Fee ................................................................................................. 7

      C.    While Robinhood Actively Monitored Market-Level Indices and Competitor
            Interest Rates, the Rates it Paid Non-Gold Customers Were Divorced from these
            Economic Benchmarks and What Program Banks Were Willing to Pay ........................ 8

      D.    Robinhood Retained the Vast Majority of the Interest Paid by Program Banks for
            Itself, Depriving Non-Gold Customers of the Benefits of Rising Interest Rates
            in the Market .................................................................................................... 9

      E.    After This Action Was Filed, Robinhood Ended the Program for Non-Gold
            Customers ....................................................................................................... 10

      F.    Plaintiff Dey Enrolled in the Non-Gold Program and Was Subject to
            Robinhood's Uniform Agreement and Conduct ...................................................... 10

III.  LEGAL STANDARD ......................................................................................................... 10

IV.   ARGUMENT .................................................................................................................... 11

      A.    Plaintiff and the Proposed Class Plainly Meet the Requirements of Rule 23(a) ....... 12

            1.    The Class Is Sufficiently Numerous ....................................................... 12

            2.    Multiple Common Questions of Law and Fact Exist .................................. 12

            3.    Plaintiff's Claims Are Typical of the Class .............................................. 14

            4.    Plaintiff and Class Counsel Will Adequately Represent the Class .............. 14

      B.    The Rule 23(b)(3) Requirements Are Readily Met .................................................. 15

            1.    Common Questions of Law and Fact Predominate ..................................... 16

            2.    A Class Action Is Superior to Individual Actions ...................................... 24

      C.    Interim Class Counsel Should Be Appointed Class Counsel .................................... 25

V.    CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alger v. FCA US LLC,*
  334 F.R.D. 415 (E.D. Cal. 2020) ........................................................................................ 20

*In re Apple Inc. Device Performance Litig.,*
  347 F. Supp. 3d 434 (N.D. Cal. 2018), *on reconsideration in part*, 386 F. Supp. 3d 1155
  (N.D. Cal. 2019). ..................................................................................................... 21, 22

*In re Bank of Am. Cal. Unemployment Benefits Litig.,*
  2025 WL 2816808 (S.D. Cal. June 24, 2025) ........................................................ 3, 16, 18, 21

*Bee, Denning, Inc. v. Cap. All. Grp.,*
  310 F.R.D. 614 (S.D. Cal. 2015) ......................................................................................... 15

*Berrien v. New Raintree Resorts Int'l, LLC,*
  276 F.R.D. 355 (N.D. Cal. 2011) ..................................................................................... 4, 20

*Briseno v. ConAgra Foods, Inc.,*
  844 F.3d 1121 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 313 (2017) ........................................ 12

*Brooks v. Thomson Reuters Corp.,*
  2023 WL 9316647 (N.D. Cal. Aug. 10, 2023) ........................................................................ 21

*Cabrera v. Google LLC,*
  2023 WL 5279463 (N.D. Cal. Aug. 15, 2023) ............................................................... 12, 21, 22

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ............................................................................................................ 22

*Dey v. Robinhood Mkts., Inc.,*
  2026 WL 636718 (N.D. Cal. Mar. 6, 2026) ............................................................................ 20

*Dey v. Robinhood Mkts., Inc.,*
  780 F. Supp. 3d 882 (N.D. Cal. 2025)............................................................................. *passim*

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) .............................................................................................. 11

*Ellsworth v. U.S. Bank, N.A.,*
  2014 WL 2734953 (N.D. Cal. June 13, 2014)..................................................................... 13, 19

*Feller v. Transamerica Life Ins. Co.,*
  2017 WL 6496803 (C.D. Cal. Dec. 11, 2017)...................................................................... 4, 18

*Frasco v. Flo Health, Inc.,*
  349 F.R.D. 557 (N.D. Cal. 2025) ........................................................................................ 12

*Gilbert v. MoneyMutual, LLC*,
    318 F.R.D. 614 (N.D. Cal. 2016) ............................................................................ 16

*Gonzalez v. U.S. Immigr. & Customs Enf't*,
    975 F.3d 788 (9th Cir. 2020) .................................................................................. 10

*In re JP Morgan Chase Cash Sweep Program*,
    24-cv-06404 (S.D.N.Y. Jun. 27, 2025), ECF No. 103 ............................................ 11

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ............................................................................ 4, 22

*Lamartina v. VMware, Inc.*,
    2024 WL 3286059 (N.D. Cal. July 2, 2024) ........................................................... 12

*Liberty Cap. Grp. v. Oppenheimer & Co.*,
    811 F. Supp. 3d 647 (S.D.N.Y. 2025) .............................................................. *passim*

*Lytle v. Nutramax Lab'ys, Inc.*,
    114 F.4th 1011 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308, (2025) ................... 22

*Maldonado v. Apple, Inc*,
    2021 WL 1947512 (N.D. Cal. May 14, 2021)......................................................... 22

*Menagerie Prods. v. Citysearch*,
    2009 WL 3770668 (C.D. Cal. Nov. 9, 2009) .......................................................... 19

*Newton v. Am. Debt Servs., Inc.*,
    2015 WL 3614197 (N.D. Cal. June 9, 2015)................................................. 3, 16, 20

*Nguyen v. Nissan N. Am., Inc.*,
    932 F.3d 811 (9th Cir. 2019)............................................................................ 22, 23

*Noll v. eBay, Inc.*,
    309 F.R.D. 593 (N.D. Cal. 2015) ........................................................................... 14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022)........................................................................ 10, 15, 17

*Opperman v. Path, Inc.*,
    2016 WL 3844326 (N.D. Cal. July 15, 2016) .................................................... 19, 24

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015)................................................................................. 22

*Rodriguez v. Google LLC*,
    2024 WL 1486139 (N.D. Cal. Apr. 5, 2024)........................................................... 14

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018)................................................................................. 15

*In re Tesla Advanced Driver Assistance Sys. Litig.*,
    350 F.R.D. 119 (N.D. Cal. 2025) ....................................................................................*passim*

*Vaccarino v. Midland Nat'l Life Ins. Co.*,
    2013 WL 3200500 (C.D. Cal. June 17, 2013) ............................................................... 19

*Williams v. Apple, Inc.*,
    338 F.R.D. 629 (N.D. Cal. 2021) ................................................................................ 16

*Wolph v. Acer Am. Corp.*,
    272 F.R.D. 477 (N.D. Cal. 2011) ................................................................................ 11

*Yue v. Conseco Life Ins. Co.*,
    282 F.R.D. 469 (C.D. Cal. 2012) ................................................................................ 19

**State Cases**

*Nedlloyd Lines B.V. v. Superior Ct.*,
    834 P.2d 1148 (Cal. 1992) .......................................................................................... 21

*Washington Mut. Bank, FA v. Superior Ct.*,
    15 P.3d 1071 (Cal. 2001) ............................................................................................ 19

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ......................................................................................... 20

**Rules**

Fed. R. Civ. P. 23 ....................................................................................................*passim*

Plaintiff respectfully submits this Memorandum of Law in Support of his Motion, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, to appoint Plaintiff as Class Representative, appoint Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Carella Byrne Cecchi Brody & Agnello, P.C. ("Carella Byrne") as Class Counsel, and certify this action as a class action. In further support of the Motion, Plaintiff submits the Declaration of Melissa L. Yeates, dated May 15, 2026 ("Yeates Decl.").

## I.   PRELIMINARY STATEMENT[1]

Robinhood introduced its Deposit Sweep Program (the "Program") in 2019, portraying itself as a disruptor of the traditional brokerage industry by putting the interests of its customers first. In the Program's Mission Statement, Robinhood boasted: ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████  Yeates Decl., Ex. 1, at 383-84.

However, when the allure of rising interest rates became too great for it to resist, Robinhood abandoned its purported goal of doing ████████ and instead reaped millions at its customers' expense by turning its customers' sweep deposits into a significant revenue driver for itself. Beginning on September 23, 2022, despite its promises to its customers, Robinhood executed on its decision to ████████████████ for itself. *Id.* at 383. Rather than providing Non-Gold customers with interest rates that varied based on "economic and business conditions" and were "determined by the amount the Program Banks are willing to pay" minus an appropriate fee as it promised,[2] Robinhood began ████████████████

████████████████████████████████████

████████████████████████████████. Yeates Decl., Ex.

---

[1] Unless otherwise noted, all emphases are added, all internal citations and quotations are omitted, all defined terms have the same meaning used in the Amended Complaint (ECF No. 70, and all references to ¶ refer to paragraphs in the Amended Complaint.

[2] Yeates Decl., Ex. 4, at 865, 869.

1, at 383. It did this by providing an interest rate to Non-Gold members divorced from economic and business conditions and what the Program Banks were willing to pay so that it could take the substantial spread between the rate it paid Non-Gold customers and the rate it received from Program Banks for itself.

As a result, Robinhood provided Non-Gold customers an artificially low 1.5% interest rate at the same time market rates were rapidly increasing and remained high. Robinhood did not vary this rate based on prevailing economic and business conditions or the amount Program Banks were willing to pay but instead kept this rate fixed for 20 months, until May 2024 when it slashed the rate to 0.01%, again, while market rates remained elevated. Appendix A ("App. A").

The artificially low rate Class members received was *not* because Robinhood had difficulty negotiating favorable rates with Program Banks. Indeed, the exact opposite is true. Between September 2022 and May 2024, the federal funds target rate rose from 3.25% to a sustained high of 5.5% and ███████████████████████████████████████████ ████████████████████████ Yeates Decl., Ex. 2, at ¶¶47, 74, 75. Instead of sharing the benefits of this rising interest rate environment with its Non-Gold customers, Robinhood acted unfairly and without good faith when it took the vast majority of interest income earned on Non-Gold customers' uninvested cash for itself. It did this by unilaterally setting an artificially low interest rate for Class members and extracting a substantial fee designed to capture an ever-increasing spread between the rate paid by Program Banks and the rate Robinhood provided to Non-Gold customers. In doing this, it treated all Non-Gold members the same, paying all the same low rate divorced from market conditions, so that it could take an inappropriately high share of the returns for itself.

Specifically, Robinhood engaged in a uniform, common course of conduct when (i) promising Non-Gold customers an interest rate that would vary based on prevailing economic and business conditions and determined by the amounts the Program Banks were willing to pay, minus its fee, if any, in exchange for their participation in the Program; (ii) providing Non-Gold customers an interest rate that did not vary based on economic and business conditions and was not determined by the amount the Program Banks were willing to pay; (iii) taking a significant spread between the rate Program Banks paid and the rate Robinhood provided to Non-Gold customers as its "fee"; and (iv)

keeping the vast majority of interest earned on Non-Gold customers' uninvested cash for itself.

Courts routinely certify classes asserting claims for breach of the implied covenant and violation of the Unfair Competition Law ("UCL"), such as those asserted here, based on a defendant's uniform conduct. *In re Bank of Am. Cal. Unemployment Benefits Litig.*, 2025 WL 2816808, at *38 (S.D. Cal. June 24, 2025); *Newton v. Am. Debt Servs., Inc.*, 2015 WL 3614197, at *10 (N.D. Cal. June 9, 2015).

Here, Robinhood's common conduct make this case particularly well-suited for certification. As such, Plaintiff[3] moves for certification of the following class under Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons who were Robinhood Non-Gold members at any time between September 23, 2022 through November 10, 2025 who had cash deposits in one or more Program Banks pursuant to Robinhood's Deposit Sweep Program, excluding the Excluded Non-Gold Members.

Excluded from the Class[4] are "Excluded Non-Gold Members" defined as:

> a. Any person who enrolled in Robinhood Gold at any point beginning and/or subsequent to September 23, 2022, effective the date in which they enrolled in Robinhood Gold, even if they subsequently unenrolled in Robinhood Gold.
>
> b. Any person who enrolled in Robinhood Gold at any point prior to September 23, 2022, who was enrolled on September 23, 2022, and who at any point subsequent to September 23, 2022 unenrolled.

The requirements of Rule 23(a) are easily met here. First, the Class contains millions of Robinhood customers whose uninvested cash was swept to Program Banks through the Deposit Sweep Program. Second, the key factual and legal questions at issue in this litigation—including whether Robinhood frustrated the purpose of the Program and Class members' reasonable expectations and acted unfairly by failing to provide interest rates that tracked market conditions and what the Program Banks were willing to pay and by retaining the vast majority of the interest for itself—are common to the Class. Third, Plaintiff meets the typicality requirement, where he maintained a Robinhood account, was a Non-Gold member throughout the Class Period, and is

---

[3] Plaintiff refers to Basudeb Dey, the only Plaintiff who seeks to be appointed as Class representative.
[4] Also excluded from the Class are Defendants and their parents, subsidiaries, and corporate affiliates, and governmental entities.

MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-cv-07442-RFL

pursuing the same claims as the Class based on the same uniform misconduct. Fourth, Plaintiff is an adequate representative and has retained qualified counsel, actively participated in this litigation, and has no interest adverse to members of the Class.

Certification is also appropriate under Rule 23(b)(3). Common questions concerning Robinhood's uniform conduct predominate Plaintiff and Class members' implied covenant and UCL claims, both of which are routinely certified. *See Feller v. Transamerica Life Ins. Co.*, 2017 WL 6496803, at *12 (C.D. Cal. Dec. 11, 2017); *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 363 (N.D. Cal. 2011). Plaintiff has also set forth a common methodology for calculating damages that can be applied classwide. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017). And a class action is a superior method for resolving the claims of the millions of Robinhood Non-Gold customers who maintained balances in the Program and were paid an interest rate divorced from prevailing economic and business conditions and the amounts the Program Banks were willing to pay. Indeed, as Judge Rakoff recognized in a similar cash sweep action, "each of the central issues in this litigation appears to be 'capable of classwide resolution,'" where customers were "subject to the same terms and conditions," and "participants were paid common interest rates that varied only by date and by the cash balances that participants maintained." *Liberty Cap. Grp. v. Oppenheimer & Co.*, 811 F. Supp. 3d 647, 663 (S.D.N.Y. 2025) ("Oppenheimer").

Accordingly, Plaintiff respectfully requests that the Court certify the Class under Rules 23(a) and (b)(3), appoint Plaintiff Dey as Class Representative, and appoint Kessler Topaz and Carella Byrne as Class Counsel.

## II.    BACKGROUND

### A.    Robinhood Promised to Pay Non-Gold Customers an Interest Rate on their Uninvested Cash that Varied Based on Prevailing Business and Economic Conditions and Was Determined by the Amount the Program Banks Were Willing to Pay, Minus Its Fee, if Any

Robinhood is a financial services company that operates an online platform through which it provides brokerage and other services to retail customers. ¶21. Through this platform, Robinhood allows its customers to trade U.S.-listed stocks, exchange traded funds, options, and American Depository Receipts. ¶21. Robinhood knowingly targets novice and less-sophisticated investors

under the guise of democratizing finance, and has acknowledged that "millions of . . . customers [who] have used Robinhood to enter the financial markets for the first time." ¶¶22-23; *see also* Yeates Decl., Ex. 3, at 627 ("███████████████████████████████████████.").

One of the services Robinhood offered to its customers was its Deposit Sweep Program, which it represented was a way for customers to earn interest on uninvested cash based on prevailing economic and business conditions, and determined by the amount the Program Banks[5] were willing to pay on the Deposit Accounts minus the fees, if any, taken by Robinhood. Yeates Decl., Ex. 4, at 865, 869; *see also* Yeates Decl., Ex. 2, at ¶22. Under the Program, uninvested cash balances in customers' brokerage accounts are automatically transferred into interest-bearing accounts at various Program Banks. Yeates Decl., Ex. 4, at 863. ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████. Yeates Decl., Ex. 2, at ¶¶47, 74, 75. As Robinhood has explained in regulatory filings, the purpose of the Program is to "provide[] ***additional value to [its] brokerage customers by allowing them*** to earn interest on uninvested brokerage cash swept to [its] [P]artner [B]anks." Yeates Decl., Ex. 5, at 179. And Robinhood represented in mass communications to customers they could "earn 16x more in interest than the national average." Yeates Decl., Ex. 6, at 1; *see also* Yeates Decl., Ex. 7.

The Program is operated by IntraFi Network LLC f/k/a Promontory Interfinancial Network ("IntraFi") through its IntraFi Network Deposit service. Yeates Decl., Ex. 4; Yeates Decl., Ex. 8. The IntraFi network "████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████ Yeates Decl., Ex. 8, at 414. ██████████████████████ ████████████████████████████████████████████. *Id.*; Yeates Decl., Ex. 4, at 864. The Program is governed by the IntraFi Network Deposit Sweep Program Agreement, a uniform contract between Robinhood and the Class applicable to every Robinhood member who

---

[5] "Program Banks" refers to the banks participating in the Program where Class members' funds were deposited and accrued interest.

elects to have their uninvested cash swept into interest bearing deposit accounts. *See, e.g.*, Yeates Decl., Ex. 4. Under the terms of the Program, individual Robinhood customers do "not have a direct account relationship with the Program Banks," and instead "Robinhood, as your agent, will establish the Deposit Accounts for you at each Program Bank and make deposits to and withdrawals from the Deposit Accounts." *Id.* at 865. The Agreement further provides that "[i]nterest rates on the Deposit Accounts will vary based upon prevailing economic and business conditions," and that the interest earned "will be determined by the amount the Program Banks are willing to pay on the Deposit Accounts minus the fees, if any, paid to Robinhood." *Id.* at 865, 869.

Robinhood opens the accounts at the Program Banks where customers' cash will be deposited. *Id.* at 865 ("You will not have a direct account relationship with the Program Banks. Robinhood, as your agent, will establish the Deposit Accounts for you at each Program Bank."). Under Robinhood's agreement ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Yeates Decl., Ex. 8, at 417. It further provides that ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." *Id.* at 418-19.

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See id.* at 478. ████████████████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. Yeates Decl., Ex. 8, at 478.

Robinhood could "████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ *Id.*; *see also* Yeates Decl., Ex. 2, at ¶44.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██ *Id.* ██████████████████████████████████████████████

████████████████████████████████████████████. *Id.* at ¶¶47, 74,

75. ████████████████████████████████████████████████████

████████████████ *Id.* at ¶47. ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████. Yeates Decl., Ex. 9. ██

██████████████████████████████████████████

**B.** **As Interest Rates Rose and Stayed High, Robinhood Refused to Vary Non-Gold Rates Based on Economic and Business Conditions, or Determine Rates Based on the Amounts Paid by Program Banks, and Instead Kept Increasing Spreads for Itself as its Fee**

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Yeates Decl., Ex. 10, at 66. ████

████████████████████████████████████████████████████████

████████████████████████████████████. *See* Yeates Decl., Ex. 11. Thus, Robinhood adopted a strategy whereby Non-Gold members would not benefit from favorable market conditions but where instead Robinhood would enrich itself on the interest income generated by those customers' uninvested cash. ████████████████████████

---

[6] Yeates Decl., Ex. 4, at 865, 869.
[7] Yeates Decl., Ex. 7.

MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-CV-07442-RFL

Yeates Decl., Ex. 12.

. Robinhood executed this strategy by holding the interest rate paid to Non-Gold customers at 1.5% from September of 2022 to May of 2024.

. *See* Yeates Decl., Ex. 13.

*Id.* at 569. That same month,

Yeates Decl., Ex. 14.

Yeates Decl., Ex. 15, at

*Id.*

Yeates Decl., Ex. 16.

**C.    While Robinhood Actively Monitored Market-Level Indices and Competitor Interest Rates, the Rates it Paid Non-Gold Customers Were Divorced from these Economic Benchmarks and What Program Banks Were Willing to Pay**

From the outset of the Program, Robinhood understood that interest rates provided to Non-Gold customers for their uninvested cash needed to track prevailing economic and business conditions. It made this promise in the DSA and negotiated rates with the Program Banks tied to the federal funds indices. Yeates Decl., Ex. 4, at 865; Yeates Decl., Ex. 8, at 478.

████████████████████████████ *See* Yeates Decl., Ex. 18. ████

████████████████████████████████████████████████████████

████████████████████████████████████████ *See* Yeates Decl., Ex. 19

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ ). *Id.* ████████████████████████████

████████████████████ . *Id.*

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ . *See, e.g.*, Yeates Decl., Ex. 20; Yeates Decl., Ex. 21; Yeates Decl., Ex. 22; Yeates Decl., Ex. 23; Yeates Decl., Ex. 24; Yeates Decl., Ex. 25; Yeates Decl., Ex. 26.

### D. Robinhood Retained the Vast Majority of the Interest Paid by Program Banks for Itself, Depriving Non-Gold Customers of the Benefits of Rising Interest Rates in the Market

████████████████████████████████████████████████████████

████████████████████████████████████ . Yeates Decl., Ex. 2, at ¶¶66-67, 69. During the period from September 2022 to May 2024, both the federal funds target rate and the effective federal funds rate—on which the Program Banks based their payments to Robinhood[9]—rose quickly and dramatically, from 3.25% and 2.58% (respectively) in September 2022 to a sustained high of 5.5% and 5.33% (respectively) from July 2023 to May 2024. App. A; Yeates Decl., Ex. 2, at App. 7. Robinhood—████████████████████████████ —chose to hold Non-Gold rates fixed at 1.50% during the same period, before slashing the rate to next to nothing (0.01%) in May 2024. App. A; Yeates Decl., Ex. 2, at ¶¶66-67, 69. And while Robinhood maintained this negligible rate until it ended the Program in November 2025, the federal funds target range's upper bound reached a low of only 4% by November 2025. App. A. ████████

---

[8] "Mighty Duck" was the codename for the Program when it was launched in 2019. Yeates Decl., Ex. 17.

[9] *See, e.g.*, Yeates Decl., Ex. 27 (basing interest rate on the federal funds effective rate); Yeates Decl., Ex. 28 (basing interest rate on the federal funds target rate).

██████████████████████████████████████████████████████

██████████████████████████████. *See, e.g.*, Yeates Decl., Ex. 27 ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████. *See* Yeates Decl.,

Ex. 19; *see also* Yeates Decl., Ex. 2, at ¶¶63-64, 66-67, 69, 76-77.

**E.    After This Action Was Filed, Robinhood Ended the Program for Non-Gold Customers**

On September 26, 2025—***the day Plaintiff's Opposition to Robinhood's Second Motion to Dismiss was due***—Robinhood announced that effective November 10, 2025, the Program would be disbanded and instead, cash sweep and corresponding interest payments would only be available to Gold members. Yeates Decl., Ex. 29, at 134 ("Beginning November 10, 2025, cash sweep will no longer be offered unless you're subscribed to Robinhood Gold.") Accordingly, Non-Gold members have been automatically removed from the Program.

**F.    Plaintiff Dey Enrolled in the Non-Gold Program and Was Subject to Robinhood's Uniform Agreement and Conduct**

Plaintiff Dey, a citizen and resident of California, has been a Robinhood customer since 2018. ¶16. During the relevant time period, Plaintiff Dey was enrolled as a Non-Gold member in the Program. App. A. During this time, Plaintiff Dey and all other Non-Gold members received identical interest rates divorced from both the rates Program Banks were willing to pay and prevailing economic and business conditions for their uninvested cash so that Robinhood could extract an exorbitant fee for itself. App. A.

**III.    LEGAL STANDARD**

A District Court has "broad discretion to determine whether a class should be certified." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 807 (9th Cir. 2020) (quoting *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010)). However, Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

Under Rule 23, class certification "is a two-step process." *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. 119, 129 (N.D. Cal. 2025) (Lin, J.). A party seeking certification must first "demonstrate that the four requirements of 23(a) are met: 'numerosity,' 'commonality,' 'typicality,' and 'adequacy.'" *Id.* Parties proceeding under Rule 23(b)(3) must also "prove the elements of predominance and superiority, such that 'questions of law or fact common to class members predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

At class certification, a court "is required to examine the merits of the underlying claim . . . only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011). "Any doubts regarding the propriety of class certification generally should be resolved in favor of certification." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 481 (N.D. Cal. 2011).

## IV. ARGUMENT

The proposed Class meets all of the requirements of Rules 23(a) and 23(b) and should be certified. Plaintiff's implied covenant and UCL claims—based on Robinhood's uniform agreements and common conduct, and Class members' objective, reasonable expectations that interest rates would be determined based on what Program Banks were willing to pay and economic and business conditions and that Robinhood would not set its own fee so high that it defeated the purpose of the Program—are particularly well suited to class treatment. Indeed, courts routinely recognize, that cash sweep actions are "an unusually easy case for class certification," given that "whatever representations were made to putative class members were made across the board, and the treatment of all of them appears to have been the same." *See* Letter Motion at 1, *In re JP Morgan Chase Cash Sweep Program*, 24-cv-06404 (S.D.N.Y. Jun. 27, 2025), ECF No. 103. Where, as here, Robinhood's "relevant promises appear in a single set of documents," Plaintiff's claims are "distinctively susceptible to classwide resolution." *Oppenheimer*, 811 F. Supp. 3d at 658.

In addition, Interim Class Counsel meets all of the requirements of Rule 23(g)(1), has and will

continue to vigorously represent the Class, and should be appointed as Class Counsel.

**A.    Plaintiff and the Proposed Class Plainly Meet the Requirements of Rule 23(a)[10]**

**1.    The Class Is Sufficiently Numerous**

Rule 23(a)'s numerosity requirement is easily met here. "In the Ninth Circuit, courts routinely hold that numerosity is satisfied when the class contains 40 members." *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 130. As discovery has demonstrated, ████████████ ████████████████████████████████ ████████████████████████████████. Yeates Decl., Ex. 15.

**2.    Multiple Common Questions of Law and Fact Exist**

The commonality requirement is also satisfied here where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality tests "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 130 (quoting *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015)). "A would-be class can satisfy the commonality requirement if there is even a single common question." *Lamartina v. VMware, Inc.*, 2024 WL 3286059, at *3 (N.D. Cal. July 2, 2024). Robinhood's uniform treatment of Program participants raises several contentions whose "determination . . . will resolve an issue that is central to the validity of each one of the claims in one stroke." *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 571 (N.D. Cal. 2025).

Here, the Program is governed by a set of uniform contracts that apply equally to each Class member and promise each Class member that the interest rates provided through the Program will "vary based on prevailing economic and business conditions" and "be determined by the amount the Program Banks are willing to pay minus the fees, if any, paid to Robinhood." Yeates Decl., Ex. 4, at 3865, 3869. Indeed, "when interpreting standardized form contracts . . . the subjective understanding of the signatories is not a factor." *Cabrera v. Google LLC*, 2023 WL 5279463, at *18 (N.D. Cal. Aug. 15, 2023). Accordingly, courts routinely find commonality established where "Plaintiffs had identical

---

[10] Though not a required showing, here the proposed Class is fully ascertainable based on objective criteria and can be identified through Robinhood's and Class members' records. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 313 (2017) ("Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification.").

MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-cv-07442-RFL

form contracts." *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at \*14 (N.D. Cal. June 13, 2014).

Given the common purpose, uniform agreements, uniform structure of the Program, and Robinhood's common conduct, Plaintiff can offer common evidence to resolve the core questions at issue in this litigation, including. *inter alia*:

1. Whether a purpose of the Program was for Non-Gold customers to earn interest on uninvested brokerage cash?

2. Whether Robinhood unfairly frustrated this purpose and reasonable expectations by providing rates that were divorced from market conditions and what Program Banks were willing to pay so that it could extract an exorbitant fee and take the vast majority of the interest earned on Non-Gold customers' uninvested cash for itself?

3. Whether Robinhood acted unfairly and lacked good faith when exercising its discretion to set rates for Non-Gold customers?

4. Whether Robinhood breached its implied covenant of good faith and fair dealing by frustrating Non-Gold customers' rights to the benefits of the Program?

5. Whether Robinhood's conduct is an unfair practice in the provision of financial products and services?

6. Whether Robinhood's decision to take the vast majority of Non-Gold customers' interest for itself outweighs any potential utility?

Here, in light of the uniform purpose and agreements governing the Program, the common contracts with the Program Banks, Robinhood's uniform conduct, and the uniform interest rates paid to Class members, common evidence is capable of resolving each of these common questions. Indeed, as the court found in *Oppenheimer*, whether the defendant "breached the implied covenant of good faith and fair dealing in administering the" program, whether the defendant violated state consumer protection law, the "interest rates [the defendant] should have paid to . . . Program participants," and the extent of class members' damages are all "issues of fact and law that are common to the proposed class." *Oppenheimer*, 811 F. Supp. 3d at 658.

MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-CV-07442-RFL

### 3.    Plaintiff's Claims Are Typical of the Class

Plaintiff Dey, as a Non-Gold customer throughout the entire Class Period,[11] was subject to the same agreements and the same common course of conduct by Robinhood and suffered the same injury as other Class members. *See In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 136 ("The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"). The typicality requirement "is permissive and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members.'" *Rodriguez v. Google LLC*, 2024 WL 1486139, at *3 (N.D. Cal. Apr. 5, 2024) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010)).

Here, Plaintiff allege that Robinhood acted unfairly and deprived Class members of the purpose of the Program and violated their reasonable expectations by providing rates that were divorced from market conditions and what the Program Banks were willing to pay so that it could extract an inappropriately high share of the interest as a fee and retain the vast majority of the interest earned on its customers' cash for itself. Plaintiff, along with all members of the Class, were subjected to the same contracts governing the Program, and to Robinhood's uniform conduct in setting interest rates and its fees under the Program, and their claims are governed by identical legal theories. Courts routinely find that typicality is satisfied where, as here, "a defendant acts uniformly toward the class members, where that uniform conduct results in injury to the class members, and where the named plaintiffs suffer a similar injury to that of the class members as a result." *Noll v. eBay, Inc.*, 309 F.R.D. 593, 603 (N.D. Cal. 2015).

### 4.    Plaintiff and Class Counsel Will Adequately Represent the Class

Under Rule 23(a)(4), adequacy requires only "that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 136 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000)). Both are met here.

---

[11] September 23, 2022 through November 10, 2025.

As an initial matter, the Court already recognized in its Order granting Plaintiff Dey's Rule 23(g) Motion, Plaintiff and Interim Co-Lead Counsel have and will continue to vigorously prosecute this action on behalf of Robinhood members. *See* ECF No. 67. Given their years of experience litigating nationwide class actions, Interim Co-Lead Counsel are plainly "qualified, experienced, and generally capable to conduct the litigation." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018) (quoting *Jordan v. L.A. Cty.*, 669 F.2d 1311, 1323 (9th Cir. 1982)). In addition, Plaintiff Dey has actively participated in this litigation for well over a year, responded to discovery requests, produced hundreds of documents, and is prepared to sit for a deposition when noticed.

Further, Plaintiff Dey's interests do not conflict with the Class. Plaintiff Dey, like every other Class member, has an incentive to maximize recovery for Defendants' wrongful conduct. *See Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 627 (S.D. Cal. 2015) ("[T]he interests of the representative parties are clear—to receive compensation for alleged violations of the [statute] and to deter Defendants from engaging in the alleged conduct—and are aligned with the interests of the putative class as a whole."). Accordingly, the requirements of Rules 23(a)(4) are satisfied.

### B.     The Rule 23(b)(3) Requirements Are Readily Met

Plaintiff's claims are readily certifiable because "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods" for adjudicating this dispute. Fed. R. Civ. P. 23(b)(3). Here, Robinhood's liability will be determined by common evidence, including: the DSAs, the IntraFi Network Deposit Sweep Program Agreement; interest rates paid by Program Banks on Robinhood Non-Gold customers' deposits; the spread Robinhood took as a fee throughout the relevant time period; the rates paid by Robinhood to its Non-Gold and Gold customers; and comparator interest rates such as those tracked by Robinhood itself, including the federal funds rate and rates offered through competitors' sweep programs and other products. Such evidence is "capable of answering a common question for the entire class in one stroke," and satisfies the requirements of Rule 23(b)(3). *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 668.

### 1.     Common Questions of Law and Fact Predominate

Where, as here, "common questions" regarding Robinhood's conduct "present a significant

aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Gilbert v. MoneyMutual, LLC*, 318 F.R.D. 614, 624 (N.D. Cal. 2016) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)). Indeed, as "both the United States Supreme Court and Ninth Circuit have stressed, a court may certify a Rule 23(b)(3) class 'even [if] important matters will have to be tried separately, such as some affirmative defenses peculiar to some individual class members.'" *Williams v. Apple, Inc.*, 338 F.R.D. 629, 648 (N.D. Cal. 2021).

Claims for breach of the implied covenant of good faith and fair dealing and for violations of the UCL are amenable to class treatment and are routinely certified, and the Court should reach the same result here. *See In re Bank of Am. Cal. Unemployment Benefits Litig.*, 2025 WL 2816808, at *38; *Newton*, 2015 WL 3614197, at *10.

### a.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Common issues predominate Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. As the Court previously found, to prevail on the implied covenant claim, Plaintiff must show that Robinhood's "failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party." *Dey v. Robinhood Mkts., Inc.*, 780 F. Supp. 3d 882, 893-94 (N.D. Cal. 2025) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 399-400 (Cal. Ct. App. 1990)).

The Court also found that "as Plaintiff alleges, the purpose of the Program is to 'earn interest on uninvested brokerage cash,' and as such, Robinhood's decision to set a fee so high that almost no interest can be earned by the customer defeats the purpose of the agreement." *Id.* at 894 (*quoting* Complaint). As such, questions regarding whether a common purpose of the Program was for participants to earn interest on in their uninvested cash and whether Robinhood's common course of conduct frustrated that purpose and customers' reasonable expectations predominate over any individualized issues here. The Court further explained that when a party to a contract exercises "a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in

good faith and in accordance with fair dealing." *Id.* (quoting *Shirley v. L.L. Bean, Inc.*, 2019 WL 1205089, at *3 (N.D. Cal. Mar. 14, 2019)). Thus, questions regarding whether Robinhood acted unfairly and lacked good faith when exercising its discretion to set rates for Non-Gold customers also predominate.

First, the Program is governed by a common purpose and set of uniform agreements that apply equally to every Class member. The purpose of the Program is for Robinhood customers to earn interest on their uninvested cash and each Class member's participation in the Program is governed by the IntraFi Deposit Sweep Program Agreement, including Robinhood's promises under the agreement that "interest rates . . . will be determined by the amount the Program Banks are willing to pay . . . minus the fees, if any, paid to Robinhood," and "will vary based upon prevailing economic and business conditions." Yeates Decl., Ex. 4 at, 865, 869. These uniform contracts and Robinhood's uniform conduct apply to every Class member and form the basis of their implied covenant claims.

Thus, the question of whether Robinhood violated its implied covenant "by exercising its discretion to set its own fee in a manner that frustrated those provisions of the contract and ran contrary to customers' reasonable expectations," *Dey*, 780 F. Supp. 3d at 894, is answerable with common evidence showing: (1) the amounts the Program Banks paid to Robinhood; (2) the prevailing economic and business conditions; (3) the interest rates Robinhood paid to Non-Gold and Gold members; and (4) the fees Robinhood retained for itself throughout the Class Period. Such evidence is plainly "capable of resolving a common question on a class-wide basis." *Olean Wholesale Grocery Coop., Inc*, 31 F.4th at 668.

Robinhood explicitly acknowledged in regulatory filings that the purpose of the Program is to "provide[] additional value to [its] brokerage customers by allowing ***them to earn interest*** on uninvested brokerage cash swept to [its] [P]artner [B]anks." Yeates Decl., Ex. 5, at 179. The descriptions of the Program that Robinhood provided to customers similarly confirms the purpose is to allow brokerage customers to earn interest stating that participants can "earn 16x more in interest than the national average." Yeates Decl., Ex. 6, at 1; *see also* Yeates Decl., Ex. 7. Moreover, Robinhood represented that the rates it provided to Non-Gold customers would be based on prevailing economic and business conditions and the amount the Program Banks were willing to pay, minus an

appropriate fee paid to Robinhood. *See* Yeates Decl., Ex. 4. Indeed, this Court already recognized that a central issue in this case is whether "Robinhood's decision to set a fee so high that almost no interest can be earned by the customer defeats the purpose of the agreement." *Dey*, 780 F. Supp. 3d at 894.

Second, Robinhood engaged in a common course of unfair conduct, which frustrated the purpose of the Program and Non-Gold members' reasonable expectations, and raises predominating questions of fact and law. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████. *See supra* Section II.C. Despite this knowledge, Robinhood purposefully ignored market conditions when setting rates for Non-Gold members and instead, elected to provide artificially low rates and hold those rates steady until it all but eliminated the interest paid to Non-Gold members. It did this through uniform conduct designed to drive significant revenue to itself by keeping an ever-increasing spread between the amounts paid by the Program Banks on Class members' uninvested cash and the interest rates it provided to Non-Gold members, which it took as a fee. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ This common evidence will drive the resolution of this litigation and common questions regarding Robinhood's unfair uniform course of conduct predominate.

Indeed, claims for breach of the implied covenant are amenable to classwide treatment and courts routinely certify these claims. *See In re Bank of Am. Cal. Unemployment Benefits Litig.*, 2025 WL 2816808, at *38 ("[B]ecause the same form contract was used for all EDD cardholders and California law applies an objective standard, the duty of good faith and fair dealing is amenable to class action."); *Feller*, 2017 WL 6496803, at *12 n.12 ("The duty of good faith and fair dealing is

assessed under an objective standard under California law, making this claim suitable for class treatment."); *Vaccarino v. Midland Nat'l Life Ins. Co.*, 2013 WL 3200500, at *19 (C.D. Cal. June 17, 2013) (same); *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 476 (C.D. Cal. 2012) ("Similarly, the question of whether Defendant breached the implied covenant of good faith and fair dealing is also determined by an objective standard."); *Menagerie Prods. v. Citysearch*, 2009 WL 3770668, at *11 (C.D. Cal. Nov. 9, 2009).

For example, *Ellsworth v. U.S. Bank, N.A.* dealt with a claim for breach of the implied covenant under California law[12] "rooted in form contracts and the application of uniform policies to the rights and obligations under those contracts." 2014 WL 2734953, at *27. As the court explained, the duty imposed "does not require examining each plaintiff's individual expectations because those . . . are reflected in the contract. At best, the issue is [defendant's] conduct and reasonableness, and any issues there do not defeat the common issues." *Id.* The same is true here: Robinhood's liability will be established by determining whether it unfairly exercised its discretion under the contract in such a way that it frustrated the common purpose of the Program and customers' reasonable expectations by setting rates divorced from market conditions and keeping the vast majority of the interest paid by the Program Banks for itself. Indeed, the Court here has emphasized that the focus of this claim is on Robinhood's conduct, and not on the subjective understandings of individual class members. *See In re Robinhood Cash Sweep Program Litig.*, 2025 WL 3141243, at *2 ("[W]hether Dey actually reviewed the contractual provisions in question is not an element of his breach of implied covenant claim.").

The court in *Oppenheimer*, considering a challenge to another cash sweep program, reached the same conclusion. There, the defendant argued that "different interpretations" and "different

---

[12] Here, Robinhood's Customer Agreement explicitly provides that "[t]his Agreement and all transactions made in your Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof)." Yeates Decl., Ex. 30, at 766. Under California law, there are "strong policy considerations favoring the enforcement of freely negotiated choice-of-law clauses." *Washington Mut. Bank, FA v. Superior Ct.*, 15 P.3d 1071, 1078 (Cal. 2001) (quoting *Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148, 1149 (Cal. 1992)). Where, as here, a California choice of law provision governs a dispute and California bears a substantial relationship to the parties or their transactions, courts will enforce the provision. *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *7-8 (N.D. Cal. July 15, 2016).

expectations" of class members defeated class certifications, because their interpretations of the contracts at issue "likely varied over time" and "likely varied based on the reasons that class members chose to participate in the" program. *Oppenheimer*, 811 F. Supp. 3d at 664. The court rejected this argument, holding that the implied covenant claim is "governed by objective standards," that even if "class members had different interpretations and expectations . . . those interpretations and expectations do not present issues requiring individual rather than classwide resolution." *Id.* at 664-65. Magistrate Judge Illman has similarly recognized that the breach of the implied covenant claim in this case is governed by an objective standard. *See Dey v. Robinhood Mkts., Inc.*, 2026 WL 636718, at *1 (N.D. Cal. Mar. 6, 2026) ("[A]s Plaintiffs point out, the case 'will be resolved by an objective determination of whether Robinhood breached the implied covenant of good faith and fair dealing, or was otherwise unfair.'. . . The court agrees."). Robinhood's liability under Plaintiff's implied covenant claim will be established entirely through common evidence focused—as the Court has explained—on its "decision to set a fee so high that almost no interest can be earned" by its customers. *Dey*, 780 F. Supp. 3d at 894. Accordingly, common issues predominate and class certification under Rule 23(b)(3) is appropriate.

### b.    Violation of California's Unfair Competition Law

Common questions also predominate Plaintiff and the Class's UCL claim. California's Unfair Competition Law prohibits, as relevant here, any "unlawful" or "unfair . . . business act or practice." Cal. Bus. & Prof. Code § 17200. As the Court explained when it concluded Plaintiff Dey had stated a claim under the UCL's unfair prong, Plaintiff must show that the "gravity of harm resulting from Defendants' unfair conduct outweighs any potential utility." *Dey*, 780 F. Supp. 3d at 895. As with Plaintiff's implied covenant claim, the focus of their UCL claim is on Robinhood's common conduct.

"Courts regularly find predominance satisfied and certify UCL . . . class claims." *Alger v. FCA US LLC*, 334 F.R.D. 415, 425 (E.D. Cal. 2020). More specifically, "courts have recognized that where a plaintiff's claim under the 'unfair' prong 'hinges on the existence of a uniform business practice or series of practices amenable to some degree of precise definition,' certification of a Rule 23(b)(3) class may be warranted." *Newton*, 2015 WL 3614197, at *10; *see also Berrien*, 276 F.R.D. at 363 (determination of whether injury caused by fee charged to class members outweighed its

benefits under UCL unfairness prong was a common question of law). Accordingly, "[a]s with many UCL claims, the Court may 'make one uniform determination of whether the utility of the conduct outweighed the harm to class members.'" *Brooks v. Thomson Reuters Corp.*, 2023 WL 9316647, at *12 (N.D. Cal. Aug. 10, 2023); *see also In re Bank of Am. Cal. Unemployment Benefits Litig.*, 2025 WL 2816808, at *39. As such, common questions regarding whether Robinhood's uniform conduct is an unfair practice in the provision of financial products and services and whether the harm to Non-Gold customers outweighs any potential utility predominate here.

**c.      California Law Applies to Plaintiff and Class Members' Implied Covenant and UCL Claims**

Common legal issues predominate here, where California law governs the claims of Plaintiff and all Class Members. Robinhood's Customer Agreement contains a choice of law provision, which provides in relevant part that "[t]his Agreement and all transactions made in your Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof)." Yeates Decl., Ex. 30, at 766. Federal courts sitting in diversity look to the choice of law rules of the forum state to identify the applicable substantive law. *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 445 (N.D. Cal. 2018), *on reconsideration in part*, 386 F. Supp. 3d 1155 (N.D. Cal. 2019). In California, where "the parties have entered an agreement containing a choice-of-law provision, courts follow *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, (1992)" to determine which state's law applies. *Id.*

Under the *Nedlloyd* test, courts first consider the choice of law provision and whether "the various claims of putative class members fall within its scope." *Cabrera*, 2023 WL 5279463, at *35 (quoting *Washington Mut. Bank, FA.*, 15 P.3d at 1078). If the clause is applicable, it is enforceable if: (1) the chosen state bears a "substantial relationship to the parties or their transaction," and (2) "the chosen state's law is not contrary to a 'fundamental policy of California.'" *Id.*

Courts routinely hold that broad choice of law clauses, like the one involved here, which provide that an agreement "shall be governed by the law of an identified jurisdiction" reflect an intention for "that law to apply to all disputes arising out of the transaction or relationship." *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d at 446 (quoting *Nedlloyd Lines,* 834 P.2d at

1154); *see also Cabrera*, 2023 WL 5279463, at *36. Here, given the identical language in Robinhood's Customer Agreements, the choice of law clause plainly encompasses the parties' dispute. There can also be no dispute that California—where Robinhood is headquartered and where the relevant conduct occurred—has a substantial relationship to the parties' relationship and the transactions at issue. *See In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d at 447 ("California has a substantial relationship to defendant Apple because Apple has its principal place of business in California, Apple conducted much of the conduct relevant to the lawsuit in California, and Apple seeks to apply California law to its sales transactions."); *Maldonado v. Apple, Inc*, 2021 WL 1947512, at *8 (N.D. Cal. May 14, 2021) (finding a substantial relationship where the defendant was "headquartered in California"). Finally, "it is self-evident that California law is not contrary to itself." *Cabrera*, 2023 WL 5279463, at *37. Accordingly, where the parties have adopted California law, courts certify nationwide classes pursuing California claims. *See Cabrera*, 2023 WL 5279463, at *37 ("[T]he Court finds that the clause is enforceable and that the UCL governs Google's challenged location targeting practices under the Agreement."); *Maldonado*, 2021 WL 1947512, at *8. Here, the nationwide Class should be certified.

          **d.    Damages Can Be Determined on a Classwide Basis By Using a Common Methodology**

Class certification is also warranted, where Plaintiff can "offer a 'model purporting to serve as evidence of damages' that 'measure[s] only those damages attributable to [their] theory' of liability." *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 134 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). To meet this requirement, a plaintiff must only "allege that their damages arise from a course of conduct that impacted the class. But they need not show that each members' damages from that conduct are identical." *Just Film, Inc.*, 847 F.3d at 1120 (9th Cir. 2017). Indeed, the Ninth Circuit has consistently held that "individual questions of damages do not necessarily defeat class certification." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 n.2 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025); *see also Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) ("*Comcast* did not alter our holding that individualized damages issues do not alone defeat certification."); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th

Cir. 2015) (same).

Moreover, "[u]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Nguyen*, 932 F.3d at 817 (quoting *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017)). At class certification, a plaintiff "may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds, by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial." *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 134 (quoting *Lytle v. Nutramax Laboratories, Inc.*, 99 F.4th 557, 570 (9th Cir. 2024)).

Here, where each Class member was subject to the uniform operation of the Program, entered into the same form agreements with Robinhood governing their participation, and received the same rates of interest on their deposits, calculation of damages is easily resolved on a classwide basis. ▮

▮ Yeates Decl., Ex. 31, at ¶27. ▮

▮ *Id.* at ¶¶28-31. ▮

▮ *Id.* at ¶¶32-34.

▮ As the Court has recognized, the DSA "states that Robinhood pays its customers an interest rate based on the 'amount the Program Banks are willing to pay' and the 'prevailing economic and business conditions,' less the fee Robinhood extracts for itself," and that "the natural reading of these statements is that the interest rates paid to customers are determined based on the rates set by the Program Banks and prevailing market conditions." *Dey*, 780 F. Supp. 3d at 894. ▮



. *See* Yeates Decl., Ex. 2, at ¶¶4-14, 63-64, 66-67, 69, 76-78.

. *See id.* at ¶¶63-64, 66-67, 69, 76-77; *see also* Yeates Decl., Ex. 19.

These classwide damages methodologies are consistent with Plaintiff's theory of liability and support a finding of predominance. *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 134 (quoting *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010)) ("A plaintiff must present 'a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time.'").

### 2. A Class Action Is Superior to Individual Actions

Certification of Plaintiff's and Class members' claims is clearly "superior to other available methods for fairly and efficiently adjudicating" their claims against Robinhood. Fed. R. Civ. P. 23(b)(3). Such certification "is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'" *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. at 136 (quoting *Hanlon*, 150 F.3d at 1022). Here, there can be no serious dispute that a class action offers the only viable mechanism for relief for members of putative Class. While Robinhood has generated millions in revenue by depositing customers' funds with the Program Banks, the relatively small damages suffered by any individual Robinhood customer make it economically impractical to pursue such a complex and expensive case on an individual basis. *See id.* ("[N]o class member would have significant interest in pursuing individual litigation given the relatively low amount of individual losses and high expected cost of litigation."); *see also Opperman*, 2016 WL 3844326, at *17 ("As Judge Posner has observed, '[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for

MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-CV-07442-RFL

$30.'"). Accordingly, Rule 23(b)(3)'s superiority requirement is easily satisfied here.

### C.   Interim Class Counsel Should Be Appointed Class Counsel

Plaintiff also requests that the Court appoint Kessler Topaz and Carella Byrne as Class Counsel. This Court previously appointed these firms as Interim Co-Lead Counsel under Rule 23(g). ECF No. 67. Kessler Topaz is one of the nation's largest firms specializing in the prosecution of complex class action litigation. Since its founding, the firm has developed a reputation for excellence in litigating complex cases, including complex consumer fraud, unfair and deceptive trade practices, and antitrust actions, among others, and has recovered billions of dollars on behalf of the clients and classes it represents. As the firm's resume reflects, Kessler Topaz has successfully prosecuted (and is currently prosecuting) some of the largest and most complex class actions in U.S. history. Yeates Decl., Ex. 32 (KTMC Resume). Similarly, Carella Byrne is a nationally recognized law firm that has served as lead counsel, co-lead counsel, or committee member in some of the most important class actions across the nation. Yeates Decl., Ex. 33.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his Motion for Class Certification, certify the Class under Rules 23(a) and (b)(3), appoint Plaintiff as Class Representative, and appoint Kessler Topaz and Carella Byrne as Class Counsel.

DATED: May 15, 2026

Respectfully submitted,

/s/ *Melissa L. Yeates*
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Matthew T. Macken (appearance *pro hac vice*)
mmacken@ktmc.com
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and–

MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-cv-07442-RFL

Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and–

James E. Cecchi (*pro hac vice* forthcoming)
jcecchi@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile: (973)-994-1744

*Interim Co-Lead Class Counsel*

MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-CV-07442-RFL